I'm Laurel Spine with the Legal Advocacy Service, a division of the Illinois Guardianship and Commission. We are representing Robert M. in this matter. May it please the Court. I can start right with the argument or I can give you a little bit of background about Robert M. Robert M. was 32 years old at the time of these proceedings and he had a lot of teeth problems. He had been trying for some years to have his teeth problems taken care of, but he had problems getting dental insurance and then without dental insurance he had problems finding a dentist to be able to tend to his teeth problems. And he admitted to having anxiety because of the pain associated with his dental issues. And Robert voluntarily took anti-anxiety medication to help with that. Even so, during this time, he had been living with his mother, who uses a wheelchair, and he would help her with errands and he would help her at home and he would help her with getting around. And he also took care of his sister's children and home and pets when his sister and her husband, who drove a truck, were on the road for a month. Robert was good with motors and the family relied on him to keep their vehicles and other machines in good working order and Robert was glad to do that. Then in July of 2016, Robert was placed in Alton Mental Health Center on or of that year, the doctor who was treating him filed a petition for forced psychotropic medication. The trial court granted that petition, finding that Robert's level of symptomatology was sufficient in and of itself to satisfy the Mental Health Code's involuntary medication statutes, criteria for suffering, and the trial court granted that order, even though Robert was willing to take the anti-anxiety medication he had taken in the community and that was requested in that petition for forced medication. I'd like to turn first to that be due to mental illness. Two, that the suffering not be a recitation of symptoms of mental illness. And three, that it be objective. The person must, according to the statute, be exhibiting suffering. This is not supposed to be a subjective view or somebody's opinion that a person is suffering or may be suffering. Here, Robert was not suffering. He was going to groups and classes. He was participating in those. He was eating and showering. He was speaking politely with his doctor. He advocated appropriately for himself. He explained to his doctor that he felt anxious and depressed because of his teeth issues and pain. And then in the hospital, he said he felt anxious sometimes because he said he was having difficulty getting his pain and fever-reducing medicine from the nurse's station. He said sometimes he had to knock on the door or the window of the nurse's station and ask for it and that staff would ignore him or worse, they would threaten him, they would threaten to ask the doctor to give him forced psychotropic medication for bugging them. And this is not anxiety because of mental illness, because of external reactions or external actions resulting from being in the hospital. No, he had some other things going on with the teeth, didn't he? His father had died, his brother had died, his mother had been in the hospital for a period of time when she was on life support. That's right. Oh, that's right. The mother testified that there were some other stressors in the community for which he... Anxiety might have come from. Right. A contributing factor. Okay. So, yes, in the community, he was taking the anti-anxiety medication voluntarily, but     He was not taking it voluntarily. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay. Okay.         Okay. Okay. Okay. I feel bad that you... I feel bad. I feel bad for the pain related to his teeth and the mother said it may have been because of these other factors too. And Robert not only advocated for himself, your honor, but yes, in the community she testified how he had advocated for her because apparently the hospital had wanted to have a DNR room for her and he had advocated for her to be on life support and she recovered. So when those things were happening in the hospital, Robert, with the staff and getting his pain and fever reducing medication, Robert did not suffer from that. He took action. We know from the record that he made a complaint to the Department of Human Services Office of Inspector General and he said this was something he learned about in the groups and classes that he went to, that if you are having concerns on a unit that you don't do something negative about it, you do something positive about it and one thing that you can do is to make a complaint to the proper authorities and that's just what he did. So that is not an example of suffering, that's an example of taking positive action. So he's not, first of all, he's not exhibiting suffering because of mental illness. We know from even the doctor's testimony, he's going to groups and classes, he's participating, he's eating, he's showering, he speaks politely to the doctor, he advocates for himself and he consented to dental treatment. He had two courses of antibiotics, he consented to the pain and fever relief, the Tylenol Ibuprofen, he consented to two fillings so far and was starting to feel better. We know he was wait-listed for additional dental treatment that was coming up and he had not required any emergency interventions for harmful behavior on the unit. He had had no emergency medication or restraints or seclusion while he was there. So here the doctor in the state and the trial judge decided that Robert met the suffering element without really analyzing whether he did and how. And that's not the court's intent as we know from the Deborah B. case. Trial courts can't continue to find suffering just because a person has symptoms of a mental illness or because they're in hospital and not here because they're stressed for reasons unrelated to a mental illness. And this idea of suffering would make the suffering element so broad as to infringe on liberty interests. The order here should be reversed for failure to comply with the exhibits suffering element. And this court could also emphasize here that exhibits suffering is an objective standard and requires objective evidence, not someone's speculation, a subjective opinion that a person might be suffering. And I apologize for talking fast, but I know we have just the ten minutes here. I'd like to turn now to the voluntary acceptance of medication as a less restrictive alternative to forced medication. Section F of the involuntary treatment statute requires clear and convincing evidence that other less restrictive services have been explored and found inappropriate before forced medication can be ordered. One of the medications the doctor requested in the petition was an anti-anxiety medication. The doctor and Robert both testified that Robert was currently willing to take the anti-anxiety medication Klonopin, the medication he had been taking at home. And by Robert's and his mother's testimony, he had done well at home taking only anti-anxiety medication. We know that Klonopin was appropriate for Robert because the doctor named it on the petition as an appropriate medication. So there's no evidence that Klonopin was inappropriate. This is distinguishable from the Israel case where the medication that Mr. Israel was taking, Valium, was not named on the petition. The First District Appellate Court has addressed this issue and held in the Tory G case that when a respondent is willing to take some psychotropic medication but not all, then if the State is still looking to force psychotropic medication that the respondent does not want it must prove by clear and convincing evidence that the medication the respondent is willing to take has been explored and found inappropriate. If the State does not make this showing, the State cannot comply with Section F's requirement that other less restrictive services have   have been explored and found inappropriate. And then the order for involuntary medication should be reversed. How significant is the fact that I think Dr. Patel never reviewed Mr. Elm's records? He had had a prior treatment, but the doctor indicated that, well, you know, there may have been some problems with psychotropic medication at that time, but from all indications he never looked to see what medications he actually was taking. Well, those, as the State acknowledged too, those prior hospitalizations were when Robert was a minor. You know, he's 32 now. It may be those records were hard to find. I don't know. It's always good to, excuse me, it's always good to be able to look at past records, but I think maybe the bigger concern here is how treatment professionals sometimes tend to discount what their patients are telling them. That's not always the case, but here we have a respondent who has been treated as a competent person for purposes of giving treatment here, for courses of antibiotics, for fillings. He's allowed to take the pain and fever reducing medication. So in a lot of ways he's being treated as a person with capacity. We know in the community he's being treated as a person with capacity. He's allowed to take the anti-anxiety medication, which is a psychotropic medication. He's consenting to that, and he's saying I have taken these various medications before, and he's explaining to the doctor side effects from those medications, and he's not being believed, or the doctor discounts those. Okay. Thank you. May I please court counsel? My name is Sharon Shanahan, and I represent the people of the state of Illinois. Before I get into the merits of this case, I want to just very briefly touch on something in the reply brief, two things in the reply brief that touch on both of these issues. One is a discussion that the substance of what must be proven or the type of evidence must go beyond mere weight of evidence. That's the reply brief at four and at nine. So respondent is arguing that we have to look at the type of evidence, but the cases, in particular the portion of the cases that are cited for this proposition, are dealing with whether the case is moot or not. What the court is saying in those cases is that if all you're arguing is sufficiency of evidence, in this case it's probably moot because facts are facts. So you need to, if we're going to find this an exception to the mootness problem, we need to find something beyond that. So I don't think any of the cases cited for that proposition are applicable. And the other thing that I want to touch on is the standard of review. Now, the state concedes that I did misstate the standard of review in issue two. In the caption of the case, I did say abusive discretion, and it is not abusive discretion. However, it is not de novo. It is manifest weight. And defendants, the cases the defendant relies upon the strongest in both cases, Deborah B. and Tori G. both very clearly say that the standard of review for an order for involuntary administration of psychotropic medication is manifest weight. And respondents claim that on reply brief at page four, that because the state didn't write its own statement of facts, that there's no dispute in the facts. That just, number one, flies in the face of the Supreme Court rules about what has to be in an answer brief as opposed to an opening brief, and it flies in the face of what manifest weight means. So just wanted to touch on both of those two things, because I do think that it affects the weight of this case. Now, moving on to the facts of it, Justice Wharton, as you noted, Dr. Patel did not have access to these records from years before. However, I think it's very important to note that he was very familiar with this man, this is not, we used to get mental health cases in here where we actually had somebody testifying at the hearing who had never examined the respondent, and thankfully I haven't seen that in a really long time. But this is a doctor that knew this man very well. The other thing I want to point out is that when you listen to a respondent's argument, you would think that the only thing wrong with this man was that he needed some work on his teeth. And there's no doubt that he did need some work on his teeth. First thing I want to point out on his teeth is that he initially refused treatment of the teeth. Later on he did agree to it. But let's move on past teeth and hear what Dr. Patel had to say. And I know I'm rebuttal that counsel's going to come up here and say, well, that's the symptoms. But it's important to know the symptoms first. Because it's not just teeth. We have a man who believes that there's a conspiracy by other people who, excuse me, are harassing him. He has somatic preoccupations. He thinks antibiotics clear his thinking, but slows down his brain. And his ability to function, day-to-day interactions with others. He, as I said, initially refused treatment for his teeth. Even with the tooth pain. He wanted Tylenol. They offered him Tylenol. He refused to take it, even when the nurse showed him the package it came in, because he thought it might be something other than Tylenol. There was a period of time, was he taking that prior medication that he was the psychotropic? Yes. Or did they cut that off when he went to the hospital? Well, I'm not sure I can say that. I can't answer it completely. But I can tell you this is that Dr. Patel did testify that the respondent would not sign a consent to take Klonopin, even though he admitted that he was taking it. So I think at that point... So we don't know if he was taking it once he was admitted. Probably not. So could that have been the cause of his problem? If he was taking it, would he be all right? Well, it depends on... I can't answer that question. I can't answer that question. As I said, it appears in the record that he would not sign a consent to take Klonopin. So he was on it anyhow. I don't know. I don't know. I mean, I don't think the record is clear enough on that issue. But the point I would like to make is Dr. Patel felt like basically the respondent has two separate problems. He does have an anxiety problem. And you need an anti-anxiety medication. Which he's not, but he was taking. But if you're also psychotic, then an anti-anxiety medicine is not going to treat psychosis. If you have psychosis, you need anti-psychotics. But he put that on the list. To treat the anxiety. He put the Klonopin on the list to treat the anxiety. He put... Not the psychosis. Yes. No, he put anti-psychotics to treat the anxiety. And there are other things. Even if we're talking about physical things as opposed to mental illness and... If there are a possibility, and I can't ask you this to a reasonable degree of medical certainty because you're not a physician, but the anxiety could very well have an interplay with the psychosis and all the other symptomologies that the defendant is particularly exhibiting. If you have a circumstance where you're presented with, as was cited in the case by opposing counsel, where you have one medication and there is no credible evidence that it will do him any harm, and there is a possibility that overall, maybe a treatment of the anxiety may have a positive effect. It may not cure everything else, but it may have a positive effect. And if the respondent is not a danger to himself or others, if it's not going to harm him and it may help him, is that really a situation where you have a least restrictive alternative? Okay. We really quickly shifted from issue one to issue two. When I've got a flashing light, I'd be glad to address your question. Okay. As far as the least restrictive, we've kind of touched on this, which is that a psychosis is not the same as anxiety. And we have a problem with that. I mean, an orthopedic surgeon has to decide whether the knee needs surgery or maybe we're just going to trim the meniscus or whatever, but they have the knowledge. This doctor said he had anxiety and psychosis. Those are different things. You don't take, I'm trying to come up, an antihistamine to take down a fever. You don't take an antihistamine to take down a fever. You might need aspirin and an antihistamine to treat the two separate symptoms that you have, maybe a bad cold, but taking an aspirin is not going to bring down, deal with nasal problems any more than taking, well, you follow my line. Here we have a doctor who diagnosed psychosis who didn't have a fever. He had an antihistamine and an aspirin. He did more than just list the symptoms. He did list the evidence which established it. And as Deborah B. said, it's not just I would dispute the fact that defendants claim that you have to have a report of it because, or and that the doctor can't do an opinion because it says that, it indicates that, that that, here it is, respond, behave in a manner that indicates that he is experiencing some sort of emotional anguish. That's exact language from Deborah B. Can you immediately comment on this In Re Israel where, I believe it's a second district case, where they set forth a series of considerations to determine if a Respondent has the competency to refuse treatment. Are you familiar with that case? Israel? Yes. Yes, Your Honor. I believe it's cited in this case. Can you comment on that? Is this a situation where him did not have the competency to refuse treatment? Well, that was not an issue that was ever raised below or on appeal, so I don't really feel like it's something that can be addressed at this time. But I would note that, as cited by the State In Re Israel, is exactly on point, because it points out the fact that the difference between medicines that treat anxiety and medicines that treat behavioral modification, and, you know, it's not a case where the State In Re Israel court did testify, I mean, did conclude that medications that would treat delusions and paranoia were not enough when the defense said he would take Valium. Thank you, Counsel. Do you know if he was off the meds that he was taking? Judge, I think there is a presumption that he was not getting these medications because there was the petition for forced medication that was filed. And he had the conversation, I believe the transcript talks about having a conversation maybe the day before the hearing where he's saying, doctor, I'm willing to take anti-anxiety medication. And I think the State's saying he didn't sign, but he didn't sign a consent. And I think if the court looks at that in terms of a trial transcript, that was a defensive answer the doctor gave. The question is, but he was willing to take the anti-anxiety medication, but he didn't sign a consent. Well, in the reply brief, the question was raised, well, was he ever offered a consent? This was just a conversation the day before trial with the doctor. And the respondent is saying, well, I'm willing to take the Klonopin. I think that helped me in the past, and I continue to be willing to take it. And what we have here is a problem, or I think an ongoing concern with that, that least restrictive, this is, that part of the statute is so important because voluntary treatment, like voluntary admission, is favored over forced treatment. First, because it's agreed to, voluntary treatment doesn't involve the massive curtailment of liberty that accompanies involuntary treatment. This is according to the Barber H, the Supreme Court's Barber H case. Second, psychiatric evidence indicates that voluntary treatment, because it's free from compulsion, is more therapeutic and more effective than forced treatment. That's from the Supreme Court's Hayes decision, which cites to a whole bunch of other stuff, citing to that psychiatric evidence. And when people have a say in their treatment, it means they are more likely to seek it out if they need it again in the future, rather than run in the opposite direction. We want to encourage that voluntary acceptance because we don't want to have to constantly look to the courts to force it. We want people to come to that decision on their own. When they come to that decision on their own, eventually people will do advanced directives. We encourage our clients to do advanced directives, to empower themselves, to take the court out of it. You might notice that this is the same doctor from Debra B. You might notice the cases in Debra B that are cited from the second district. It's Wendy and Lisa. Those cases involve the same doctor. Now, we have other doctors who work with their patients, who work with their patients. And you were, Justice Wharton, you were hitting on this, that there is some interplay with anxiety. Doctors will sometimes work with their patients, say, what are you willing to take? Because then, if there is something they're willing to take, they can start with that. Then they're building a trust. They're building a trust with that psychiatrist. And then maybe, starting with that, then maybe the doctor can say, well, okay, now, do you think maybe you want to try a little something else? Or maybe that's going to do it. Maybe that's going to be enough. And the involuntary treatment statute is not meant to cure people. It's meant to help with their immediate needs. It's meant to be intrusive in the least restrictive way. And the state is talking about, well, let's help with anxiety and let's help with psychosis and let's help with whatever may be involved with a particular person. And I think some psychiatrists get stuck on that and think they are going to cure every last problem of a patient in their care. And that's not what the mental health statute is about. We are looking to help in the least intrusive way. And the respondent was willing to take a psychotropic medication that the doctor himself said was appropriate on this petition. And that could certainly have been explored first as an alternative to a bigger package where what is the state saying was the psychosis here? Well, there was a conspiracy harassing him. He said, I would knock on the door and ask for my pain medication and fever reducing medication for my teeth. May I finish? And I would get ignored, so I made a complaint to the Office of Inspector General.  Thank you.